Estate of Gladys Horwitz, Deceased, a/k/a Gladys Harwood, Ronald T. Howard, Executor v. Commissioner.
Estate of Horwitz v. Commissioner
Docket No. 3338-63.
United States Tax Court
T.C. Memo 1965-269; 1965 Tax Ct. Memo LEXIS 60; 24 T.C.M. (CCH) 1464; T.C.M. (RIA) 65269; October 6, 1965
*60 Stephen A. Wareck, 10 East 40th St., N. Y., N. Y., for the petitioner. Frederic S. Kramer, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the income tax of the decedent, Gladys Horwitz, also known as Gladys Harwood, for the year 1960 in the amount of $17,702.01, and an addition to tax under section 6653(a) of the 1954 Code in the amount of $885.10. The primary issue is whether funds used to make certain bank deposits and to purchase certain securities represented unreported taxable income of the decedent. Petitioner does not contest the addition of the negligence penalty to any deficiency that we might find. Findings of Fact Some of the facts have been stipulated and are so found. The decedent, Gladys Horwitz, also known as Gladys Harwood, and hereinafter referred to as Gladys, filed a timely Federal income tax return for the calendar year 1960 with the district director of internal revenue, Manhattan District, New York, New York. Gladys was born in 1899; she died in New York City on October 6, 1961, prior to the commencement of respondent's audit and investigation of her 1960 *61 return. Gladys did not enjoy good health. She suffered from diabetes, for which she took daily injections of insulin, and she frequently took pills for a heart condition. Except for a few weeks in 1959, Gladys did not work between 1945 and the date of her death; and the records of the Social Security Administration, which go back to 1937, show that she had no earnings covered by the Social Security Act. Gladys was extremely sparing in the use of money. She knew which food stores had the lowest prices on various items and would walk several blocks to save one cent. She would become considerably upset at the idea of spending a penny more than was necessary, and on at least one occasion argued at length with a tradesman who charged her a dime more than she had expected to pay. Although she occasionally entertained at her home, she served food to only certain persons who neither brought it themselves nor paid for it. One friend could not get so much as a cup of tea unless she brought her own teabag. Beginning sometime in 1943, Gladys resided in an apartment at 10 West 65th Street, New York City. The apartment was small but nice; it had one and one-half rooms, consisting of a living *62 room and dinette, a small kitchen, and a small bathroom. The living room doubled as sleeping quarters. When she first occupied the apartment, the monthly rental was $55; this was raised to $63.25 in 1947, to $66.75 in August 1957, to $68.75 in January 1958, and to $72.50 in July 1959. Gladys had savings accounts at several New York City banks. The balances in her accounts on January 1, 1945, totaled at least $7,600. Between the beginning of 1945 and the end of 1959, Gladys' various accounts earned almost $4,000 in interest. On January 1, 1960, Gladys had five savings accounts with balances totaling about $17,575. In 1945 Gladys met Abraham Breitman (hereinafter referred to as Breitman), and the two quickly became close friends. Breitman was 10 or 11 years older than Gladys. He worked as a designer of ladies' suits and coats, and earned about $250 per week. Shortly before he met Gladys, his wife had died, leaving him about $18,000. Breitman soon developed a routine of taking Gladys out to dinner every Wednesday night, and later he also ate dinner at her apartment every Saturday and Sunday. This routine was broken only infrequently while Gladys was alive. Gladys constantly complained *63 to Breitman about how poor she was. She made it clear that she wanted him to give her some money. Breitman, believing she needed the money to live on, gave Gladys $25 in cash each week for the first 4 or 5 years of their friendship, then increased the amount to $50 per week, which he gave her until she died. In addition to these regular cash gifts, Breitman gave Gladys $5 or $6 each time he ate at her apartment unless he brought the food; he gave her varying sums of money each year around Easter so that she could give dinners for her friends; and he sometimes gave her clothing, including, on one occasion, a $1,500 mink stole. From about 1955 to 1959, Breitman allowed Gladys to use his charge account at the R. H. Macy & Co. department store. During this period, Gladys charged to Breitman's account items for her own use costing about $400 each year, and Breitman paid the bills. The pecuniary benefits conferred upon Gladys by Breitman during the period of their friendship were more than sufficient to cover her living expenses during the period. Although Breitman considered Gladys his girl friend, he refused her frequent requests that he marry her. He did not want to take on the added *64 responsibilities. Breitman did not learn until after her death that Gladys was not so poor as she claimed to be, she having been very careful to conceal her modest wealth from him. During the latter part of her life, Gladys was on close terms with only one member of her family, her brother Edward ("Red") Horwitz (hereinafter referred to as Red). While Red was alive, he resided in Cleveland and Detroit and ran concessions of various types at carnivals and fairs. Red sometimes came to New York City and visited Gladys. Red and Gladys maintained a joint safe-deposit box at the main office of the National Bank of Detroit, Detroit, Michigan. Red died on October 5, 1956. When she heard about her brother's death, Gladys went to Detroit with Breitman. On October 8, she visited the safe-deposit box which she and Red had rented at the National Bank of Detroit and removed the contents. On December 6, 1956, the Safe Deposit Company of Detroit, [1]Detroit, Michigan, received notice of Red's death; when the box was opened by a bank officer on February 19, 1957, it was empty. *65 Gladys had been renting a safe-deposit box at Central Savings Bank, New York City, since December 27, 1948. Her rental of this box terminated on October 15, 1956. On November 15, 1956, she rented a different safe-deposit box at the same bank, the new box having slightly more than twice the capacity of the old. Central Savings Bank did not keep records of access to the safe-deposit boxes rented by Gladys. Red left a probate estate of $2,700, of which Gladys received $462.98 as her full inheritance plus $200 as a claim against the estate. On several occasions, one or another of her friends accompanied Gladys when she went to Central Savings Bank to visit her safe-deposit box. One such instance was in the late winter or early spring of 1960. A neighbor, Fitch W. Foster, drove Gladys to the Central Savings Bank and waited in the bank while Gladys went downstairs to the vault. Foster saw Gladys come upstairs, take some money out of her handbag, and transact some business at one of the teller's windows. Gladys told Foster that she intended to use the money to buy some Stock of American Telephone & Telegraph Company (A.T. & T.). Gladys did in fact buy 13 shares of A.T. & T. on April 26, 1960. Payment *66 for this purchase was made by a check payable to Hill, Darlington & Co., Gladys' stock brokers; the check was drawn by Central Savings Bank on its account with Chase Manhattan Bank and was purchased by Gladys with cash on April 25, 1960. A few weeks after Gladys died, her personal representative examined the contents of her safe-deposit box at Central Savings Bank. He found some papers, canceled bank account passbooks, some old jewelry, and $703 in cash. On her 1960 income tax return, Gladys reported adjusted gross income of $2,123.64, consisting entirely of dividends, interest, and a net gain from sales of stock. In his statutory notice of deficiency, respondent determined that Gladys had failed to report other income in the amount of $36,964.47. Respondent's determination was arrived at by treating as income the money used to make the following bank deposits and stock purchases: Bank Deposits
Item
Date (1960)
Bank
Amount
1
Jan. 26
Central Savings
$ 2,400.00
2
Feb. 11
Union Dime Savings
8,300.00
3
Feb. 18
Central Savings
1,700.00
4
Feb. 23
Manhattan Savings
9,000.00
5
Feb. 29
Central Savings
1,000.00
6
Mar. 8
Bank for Savings in the City of New
York
1,000.00
7
Mar. 22
Union Dime Savings
1,293.37
$24,693.37
*67 Stock Purchases
Item
Date (1960)
Stock
Amount
8
Mar. 25
100 Brooklyn Union Gas
$ 2,556.63
9
Mar. 29
100 National Dairy Prod.
4,943.50
10
Apr. 20
30 Pittsburgh Plate Glass
2,126.00
11
Apr. 20
50 Pacific Tel. & Tel.
1,463.19
12
Apr. 26
13 American Tel. & Tel.
1,181.78
$12,271.10
$36,964.47
Items 1, 3, and 5, the deposits in Central Savings Bank, where Gladys had her safe-deposit box, were cash deposits. Items 7-12 consisted of cash purchases of bank checks from Central Savings Bank; Item 7 was drawn to cash, and Items 8-12 were drawn to Hill, Darlington & Co., Gladys' stock brokers. Items 2 and 4 were bank checks purchased with cash from an unidentified bank or banks. [2]
During the course of his investigation, respondent's agent discovered no information tending to establish a taxable source for the funds used in making the questioned deposits and purchases. Opinion The issue before us is whether the funds used by Gladys to make certain bank deposits and stock purchases constituted taxable income to her in 1960. While proof of bank deposits and stock purchases *68 standing alone does not establish the receipt of taxable income, the surrounding circumstances may, and often will, indicate that an inference of taxable income is the proper one to be drawn from such proof. See (C.A. 3), affirming a Memorandum Opinion of this Court, certiorari denied, ; (C.A. 2), affirming , certiorari denied, . Respondent's determination that Gladys realized taxable income is presumptively correct, and petitioner has the burden of proving it to be erroneous. Respondent contends that petitioner has failed to carry this burden. The death of Gladys prior to the commencement of respondent's investigation undoubtedly made petitioner's burden substantially more onerous; but this misfortune does not relieve petitioner of its burden of proof. We might point out, nevertheless, that we would not be justified in drawing the same unfavorable inferences from petitioner's failure to *69 offer a complete explanation of the source of the funds in this case as we would in case of a living taxpayer. Compare It is petitioner's theory that the funds used by Gladys to make the "unexplained" bank deposits and stock purchases came from a cash hoard accumulated prior to 1960 and kept in a safe-deposit box. Despite the handicap of Gladys' death, petitioner has managed to assemble a substantial amount of credible evidence in support of its theory. Gladys was an extreme miser. [3] She began renting a safe-deposit box at a New York City Bank in 1948, only a few years after she had begun keeping company with the man who for over 15 years was to confer upon her pecuniary benefits more than sufficient to cover her living expenses. She and her brother jointly had rented a safe-deposit box in Detroit; on October 8, 1956, a few days after her brother died, Gladys visited this box and emptied it of its contents; shortly thereafter, she discontinued renting her old safe-deposit box, and soon rented another box twice the size of the old one. All of the nearly $37,000 which respondent determined to be income appeared, in the form of cash, during *70 the first 4 months of 1960; well over one-half of this amount was either deposited at or used to buy bank checks from the same bank where Gladys had her safe-deposit box. The evidence establishes with a fair degree of certainty that cash from the safe-deposit box was used to buy the bank check which paid for at least one of the "unexplained" stock purchases, the 13 shares of A.T. & T. bought on April 26. And the discovery of $703 cash in the safe-deposit box after her death confirmed that Gladys was in the habit of using the box as a cash repository. In our view, the foregoing evidence is sufficient to establish, at least prima facie, that the funds used by Gladys to make the "unexplained" bank deposits and stock purchases came from a cash hoard accumulated prior to 1960 and kept in a safe-deposit box. Our conclusion is bolstered by the failure of respondent's agent, during his investigation, to discover any evidence indicating that the funds came from some specific taxable source. Indeed, *71 the evidence of record concerning Gladys' personal characteristics, mode of living, health, and acquaintances make it appear highly unlikely that she should have realized so large an amount of taxable income in so short a period of time, as respondent's determination would require us to conclude. Having carefully considered all the evidence of record, we are of the opinion that the money used by Gladys to make the questioned bank deposits and stock purchases came from a cash hoard kept in a safe-deposit box and accumulated prior to 1960. Accordingly, we hold that petitioner has carried its burden of proving error in respondent's determination that such deposits and purchases constituted taxable income to Gladys in 1960. [4] There being no understatement of income, the penalty imposed by section 6653(a) of the 1954 Code is not applicable. Decision will be entered for the petitioner. *72 Footnotes
1. The Supplementary Stipulation of Facts, upon which this finding is based, does not explain the relationship between the National Bank of Detroit and the Safe Deposit Company of Detroit. However, the question is of no importance to the outcome of this case.↩
2. Item 6 was identified only as a $1,000 deposit.↩
3. Gladys was variously described, in regard to her attitude towards money, as "extremely penny-pinching," "kind of short," "very miserly," "very, very frugal," and "abjectly penurious."↩
4. Under the circumstances, the failure of the record to establish the exact source of the money making up the cash hoard does not affect our conclusion. If the funds came from the safe-deposit box and were acquired prior to 1960, they could not constitute taxable income in 1960, the only year before us.↩